**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.5:07CR252 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| Vs. | ) | |
| | ) | |
| SHANE MITCHELL | ) | OPINION AND ORDER |
| | ) | |
| Defendant. | ) | |

**CHRISTOPHER A. BOYKO, J:**

This matter is before the Court on Defendant Shane Mitchell's Motion to Suppress all evidence obtained as a result of the unlawful searches of Room 127 on April 1 and 2, 2007. Defendant contends the Jackson Township Police Department lacked sufficient probable cause to search the Quality Inn Room 127, therefore, any contraband or other items seized should be suppressed. In particular, Defendant contends the affidavit used to obtain the search warrant contained material misstatements. Therefore, under *Franks v. Delaware* 438 U.S. 154 (1978), those misstatements should be excised and upon their excision, there exists no probable cause to issue the warrant rendering it improper. For the following reasons, the Court grants Defendant's Motion.

## **FACTS**

The testimony before this Court at a hearing on Defendant's Motion to Suppress revealed the following facts. On April 1, 2007, Jackson Township police officers responded to a complaint by employees of Quality Inn & Suites, located at 4914 Everhard Road, Jackson Township, Ohio, of a strong smell emanating from Room 126. The hotel employees who went in to clean the room smelled a chemical odor and were concerned there was a methamphetamine laboratory inside the room. The occupants of the room requested a room change and asked for garbage bags to clean the room. When the hotel employees entered the room to clean it, they found white powder on the counters and floor and a rock-like object on the floor. One employee experienced irritation, including coughing, after exposure to Room 126. The hotel employees had awareness training on methamphetamine labs and the hotel employees symptoms were similar to the symptoms of exposure to a methamphetamine lab. Officer Monigold, who was specifically trained in "meth lab" identification, and Lieutenant Goe, responded to the call from employees. When Jackson Township officers arrived, the employees had already cleaned the room and the only smell detected by the officers were the cleaning agents used by the employees. The officers did not test for meth precursors though they had a methamphetamine kit in one officers car.

The officers took witness statements from the employees. Room 126 had been rented in the name of Jesse Palmer[1] who the officers discovered had an active arrest warrant from the

---

[1] The governments post-suppression hearing brief refers to "Jesse Palmer". The supporting affidavit of Officer Monigold refers to "Jacob Palmer". Witness statement of Neil Looker refers to "Jacob Palmer." Officer Monigold's testimony at the suppression hearing refers to "Jesse Palmer". The driver's license attached as evidence to ECF #21-3 is in the name of Jacob Palmer.

Stark County Sheriffs Office for Obstructing Official Business. The officers were told by the hotel employees the occupants of Room 126 had moved to Room 127. Room 127 was rented in the name of George Curlutu, Jr., a man purportedly involved in drug trafficking according to the affidavit of Officer Monigold, a Jackson Township officer. After a brief time spent in Room 126, the officers could not confirm that a meth lab had been on the premises, though the officers still had concerns. They placed a call to Assistant Prosecutor Chris Hartnett, advising her of the circumstances at the Quality Inn and asked for authority to search Room 127. It is unclear what exactly the officers told the assistant prosecutor when seeking permission to enter Room 127 but, based upon the statements by the officers, Prosecutor Hartnett advised the officers they could enter Room 127. Officers Goe and Monigold, accompanied by Neal Looker, an employee of Quality Inn, entered Room 127 when Looker, using a key, opened the door. The officers took a cursory walk through the room and found nothing indicating a meth lab, only a bag of garbage by the front door. The officers allegedly took the garbage bag from the room and inspected the contents although its removal was disputed by Looker. Officer Monigold reportedly found six caffeine pill jars, a ten dollar bill and some small baggies with white powder residue. Sometime that afternoon of April 1, 2007, Officer Monigold determined there was no meth lab. Monigold believed further investigation was warranted because a fugitive rented Room 126, a purported drug trafficker rented Room 127, caffeine pills are commonly used to mix cocaine and he was concerned that there were reportedly children with the occupants. The officers then left the scene with instructions to hotel staff to inform them when the occupants of Room 127 returned. Just after midnight on April 2, 2007, hotel staff notified Jackson Township police the occupants had returned. Officers Monigold, John Crane and other personnel went to the Quality Inn. The

officers knocked on the door, a man answered the door and when asked his name indicated he was Jack Mitchell.  He furthered stated he had two social security numbers but could not give officers either one.  When asked if there was anyone else in the room he stated his girlfriend and children were also in the room.  The officers testified they believed the man, who was wearing boxer shorts, was being deceitful, and they asked him to get dressed.  The officers further testified they were concerned there was at least one fugitive associated with the rooms.  The officers told the man they were going to escort him into the hotel room so he could provide the officers with identification.  Officer Crane testified he entered the room to ensure officer safety and because the man had been untruthful.  The man gave no response and the officers entered the room. Upon entering the room, the officers noticed drug paraphernalia, plastic baggies and a baggie filled with green matter and pills.  Officer Crane also noticed a partially covered bag with white powder.  When Officer Crane asked, "what is this" the man stated, "it's mine."  The man then identified himself as Shane Mitchell and informed the officers he had an outstanding warrant.  After confirming there was a warrant and after examining Mitchell's personal identifiers, the officers placed him under arrest.  The officers also discovered Jantre Sybole in the room and arrested her upon discovery that she had an outstanding warrant.  Officer Monigold then called the Massillon Municipal Prosecutor's office and the Prosecutor said she would get a search warrant affidavit drafted.  Officer Monigold left to prepare the affidavit.  After reviewing the affidavit of Officer Monigold, the Municipal Court judge issued a search warrant for Room 127 of the Quality Inn, on April 2, 2007.  As a result of the search conducted by Jackson Township police officers, the officers seized crack cocaine, cocaine powder, marijuana and a handgun.   They also discovered $4,000 in Jantre Sybole's purse.  Laboratory tests confirmed

246.24 grams of crack cocaine, 32.28 grams of powder cocaine and 114.47 grams of marijuana.

On October 1, 2007, Defendant filed his Motion to Suppress and on November 28, 2007 the Court held a hearing on Defendant's Motion to Suppress.  The Motion to Suppress alleges material misstatements in the affidavit in support of the search warrant making the officers entry into Room 127 unconstitutional, therefore, any evidence or contraband obtained by the faulty warrant and unlawful entry must be suppressed.

## **LAW AND ANALYSIS**

The Fourth Amendment to the United States Constitution states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

A reasonable expectation of privacy extends to hotel rooms.  *See, e.g., Hoffa v. United States,* 385 U.S. 293, 301 (1966) ("A hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office."); *Johnson v. United States,* 333 U.S. 10, (1948). See also *United States v. Bass,* 41 Fed. Appx. 735, 737 (6th Cir. 2002) (hotel guest had privacy interest in hotel room sufficient to protect him from warrantless search and seizure.)

"It is well-settled that a person may waive his Fourth Amendment rights by consenting to a search."  *United States v. Clark,* 378 F.3d 584, 587 (6th Cir. 2004) citing *Davis v. United States,* 328 U.S. 582, 593-94 (1946). "Consent to a search 'may be in the form of words, gesture, or conduct.'" *Clark* at 587 quoting *United States v. Griffin,* 530 F.2d 739, 742 (7th Cir.1976). "In whatever form, consent has effect only if it is given freely and voluntarily." *Clark* at 587 citing

5

*Bumper v. North Carolina,* 391 U.S. 543, 548 (1968).

The evidence before this Court does not substantiate the Government's contention that probable cause existed to enter Room 127 on April 2, 2007. Officers Monigold and Crane testified they ***told*** Defendant they were coming into the hotel room. There was no opportunity for Defendant to consent because the Officers did not ask for consent to enter the hotel room. Officer Monigold testified, "...so we said, "we're going to walk in with you. We're going to accompany you, due to the fact that you are not helping us determine your well being or your identity. We have reason to believe that there might be a wanted person in this room. For our safety, we're going to accompany you." (TR p. 23). Again, on cross-examination Officer Monigold testified, "We told him we were going to accompany him to get dressed." (TR p. 71). Then, on further cross, Officer Monigold was asked,

> Q. "Let's be clear about this. Mr. Mitchell did not invite you guys in at any point right?
>
> A. That's correct. But he didn't object either.
>
> Q. But he did not invite you in?
>
> A. That's correct.
>
> Q. You didn't have consent to come in the room?
>
> A. That's correct. (TR p. 72).

Finally, Officer Monigold when asked about the reason for entering the hotel room on April 2, 2007, stated, "for our safety, yes." (TR p. 73). Although he expressed some concern for the safety of the children in the hotel room, Monigold testified he saw them sleeping or laying on a couch while he stood in the doorway. The testimony of Officer Monigold expressly states the

reason for the entry was the safety of the officers. (TR p. 73).

Officer Crane testified, "Then we asked if we could escort him into the room to provide identification to show us who he is, and also for the officers' safety, due to the fact he was deceptive on his identity, who he was, could not give us any physical identifiers about himself as far as his date of birth, where he lived, and pertinent information that he was being deceptive about." (TR p. 122-123). Later he said, "I asked the defendant–we were going to escort him into the room, and at no time did he ever object. He went into the room." (TR p. 123). Upon further direct examination Officer Crane testified as follows:

> Q. "And when you said you wanted to go in the room, escort him in the room, he didn't say yes, and he didn't say no. is that right?
>
> A. Correct. He did not object to us going in the room with him.
>
> Q. Was he silent?
>
> A. No.
>
> Q. I mean, what was his reaction when you said you were going to escort him to the room?
>
> A. That was fine. I mean, he gave no objection the whole time I was talking to him."

(TR p. 127).

On cross-examination, Officer Crane was asked how Defendant could be facing the officer if Officer Crane followed Defendant into the hotel room. Officer Crane responded, "because he is facing me as we're facing, and if you were a little closer to me, we are in close proximity together, and I said, 'we are going to escort you into the room to make sure there is no one else in here,' which he did not object and --"

7

> Q. He didn't consent to you entering the room, did he?
>
> A. I said, " I am going to follow you into the room." He did not say I don't want you in my room.
>
> Q. I think it's a yes or no question. Did he consent to allowing you to enter the room?
>
> A. Not yet.
>
> Q. The question is did he consent to allowing you to enter the room?
>
> A. He did not object.

Upon questioning by the Court whether Officer Crane believed he had an independent basis for entering the hotel room he answered: "the basis is the unknown factors. Are there other suspects in there. We are looking for people with warrants, the safety of the children.... Who is hiding in the bathroom." (TR p. 143).

The testimony demonstrates the officers told Defendant they were entering the room. Officer Monigold recalled telling Defendant "we are going to accompany you." Officer Crane initially said he asked for consent to enter the room, then upon further direct examination and on cross said they told Defendant they were going to enter the room. This version matches the version of events as described by Officer Monigold. Therefore, the Court finds the officers did not ask for consent but merely instructed Defendant they were escorting him in the room.

Even if this Court were to find the officers asked for permission to enter the hotel room, there is no evidence Defendant consented. In, fact Officer Monigold expressly stated they had no consent to enter the room. Defendant's action in walking back into the room after an instruction by officers does not indicate consent but rather a submission to authority. See *United*

8

*States v. Jones,* 641 F.2d 425 (6th Cir.1981) (citing *Johnson v. United States,* 333 U.S. 10, 13 (1948)) (Defendants backward movement indicated  "submission to authority rather than as an understanding and intentional waiver of a constitutional right.") The evidence before this Court does not support the Government's contention that Defendant "freely and voluntarily" consented to waive his Fourth Amendment rights.

"When there is neither a warrant nor consent, courts will only permit a search or seizure to stand under extraordinary circumstances." *United States v. Chambers,* 395 F.3d 563, 565 (6th Cir. 2005).  Having determined there was no consent, the Court must then consider whether there was probable cause to enter the room absent a warrant.  The establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates,* 462 U.S. 213, 244 n. 13, (1983)). "Where a warrantless search has infringed an individual's Fourth Amendment rights, the Court must then examine the warrantless search to see if exigent circumstance and probable cause warranted the search ." *United States v. Bass*, 41 Fed. Appx. 735, 738 (6th Cir. 2002), citing *Coolidge v. New Hampshire,* 403 U.S. 443, 454-55 (1971); *Pray v. City of Sandusky,* 49 F.3d 1154, 1158 (6th Cir.1995); *United States v. Morgan,* 743 F.2d 1158, 1161 (6th Cir.1984), *cert. denied,* 471 U.S. 1061(1985) ("Absent exigent circumstances, police officers may not enter an individual's home or lodging to effect a warrantless arrest or search."). "In determining whether exigent circumstances existed, the Court looks to "(1) whether immediate government action was required [and] (2) whether the governmental interest was sufficiently compelling to justify a warrantless intrusion ...." *United States v. Rohrig,* 98 F.3d 1506, 1521 (6th Cir.1996).

The Court finds the Government has failed to demonstrate the existence of probable

cause and exigent circumstances to justify entering the hotel room. First, it is unclear what danger, if any, the occupants of the hotel room presented to the officers. The evidence indicates up to five officers went to the hotel on April 2, 2007. Officer Crane and Monigold went to Room 127, which was not registered to Palmer, who was the name on the registry for Room 126. Even if Room 127 were registered in Palmer's name, the outstanding warrant was for Obstructing Official Business, not for a violent offense. There is no evidence that Palmer or Curlutu, the latter in whose name Room 127 was registered, were known to be violent or presented a physical threat to the officers. Officer Crane testified he is six feet four and was described as "big-boned". The officers had descriptions of both Palmer and Curlutu. Curlutu's driver's license listed him as 5'9" and 150 lbs and Palmer was listed as 5'9" 200 pounds. The was no evidence that either men had a history of carrying weapons on their persons and there was no evidence of a reasonable belief by the officers that there was a weapon in the hotel room. When the officers knocked on the door and Defendant opened the door, the evidence indicates he was wearing boxer shorts. Officer Monigold testified when Defendant answered the door of the hotel room, the officers knew he was not Curlutu, and that he did not fit the description of Palmer, though his face looked like Palmer, so they were unsure who he was. Again, there is no evidence there was any cause to be concerned for their safety other than the requisite caution all officers exercise when confronting the unknown. The facts fail to support probable cause that criminal activity, especially methamphetamine production, was occurring in Room 127.

     Nor was there evidence of an exigent circumstance justifying entry into Room 127 without a search warrant. Officer Monigold testified he saw the children from the open hotel door, either sleeping or laying on the couch. There is no evidence they were in any danger at

that time. Furthermore, the Officers did not smell any methamphetamine precursors when Defendant opened the door. Finally, Defendant informed the officers his girlfriend was in the bathroom. However, Officer Monigold expressly testified, "we weren't entering the hotel room to look for a wanted person at that time. We were trying to get identity so he could prove who he was." (TR p. 71). This Court is unaware of any authority permitting officers to enter, absent a warrant or consent, an occupied hotel room with a Fourth Amendment expectation of privacy, to get identification of an occupant. In short, there was neither evidence of criminal activity occurring in Room 127, nor was there an exigent circumstance allowing the warrantless entry in to Room 127. Therefore, the Court finds the officers illegally entered Room 127 on April 2, 2007.

The Court also finds there was no probable cause to search Room 127 on April 1, 2007. When the officers responded to hotel employees' concerns that a methamphetamine lab had been set up in Room 126, the officers entered the room which had already been cleaned. Therefore, they were unable to corroborate that a meth lab had been in Room 126. There was no smell that would indicate a meth lab, and no residue or traces of precursors. Officer Monigold had a methamphetamine testing kit in his vehicle and never removed it to test for meth because there was nothing to test. Officer Monigold still had "concerns" and called Assistant Prosecutor Hartnett and asked if he had authority under Ohio Revised Code Section 2933.33 to search Room 127 without consent or a search warrant. Assistant Prosecutor Hartnett determined the statute permitted such entry and Officer Monigold and Goe searched Room 127.

O.R.C. §2933.33 states:

**Search of premises for illegal manufacture of methamphetamine**
(A) If a law enforcement officer has probable cause to believe that particular premises are

>used for the illegal manufacture of methamphetamine, for the purpose of conducting a search of the premises without a warrant, the risk of explosion or fire from the illegal manufacture of methamphetamine causing injury to the public constitutes exigent circumstances and reasonable grounds to believe that there is an immediate need to protect the lives, or property, of the officer and other individuals in the vicinity of the illegal manufacture.

Again, the Court finds no probable cause existed to search Room 127. The officers could not corroborate the existence or even an indication of a meth lab in Room 126. Employees complained of an acetone smell which officers testified is used in the manufacture of methamphetamine. When the officer checked Room 126 he did not smell acetone, rather he smelled chlorine. There is no testimony that chlorine is used in the manufacture of methamphetamine. Without any corroborating evidence of a meth lab in Room 126, the Court finds there was no probable cause to justify the warrantless search of Room 127. There was no witness testifying of chemical smells emanating from Room 127. The occupants move from Room 126 to Room 127 and the occupants desire for trash bags to clean their own room concerned the hotel cleaning staff. Officer Goe testified the reason they went into Room 127 was "we had concerns that there was possibly a methamphetamine lab, and there was obviously a great health danger. One of the cleaning people had also mentioned to us that apart from the two gentlemen that apparently rented the room, there was a third gentleman there with a child or a younger boy, so we had concerns about their safety and condition, so we ended up, after no one responded from knocking, the manager opened up the room for us." (TR p. 96). Because there was no testimony or evidence that any illegal activity was occurring in Room 127 and the officers could not find any evidence of the occurrence of criminal activity in Room 126, there did not exist any probable cause to search Room 127. Nor is there any evidence of any exigent circumstance justifying the entry into Room 127 without a warrant. The cleaning personnel had

testified there was white powder throughout Room 126. The cleaning personnel swept the room but had not emptied the sweeper. Officer Monigold testified he did not empty the sweeper and test its contents because the cleaning personnel had cleaned other rooms that day as well as Room 126. Although it still may not have risen to the level of an exigent circumstance, if the officers had tested the contents of the sweeper and found precursors to methamphetamine it would have presented a better argument that the inherent dangers of the chemicals used in meth lab being present in the hotel justified a search of Room 127, when coupled with the testimony of the cleaning personnel. However, without any evidence of a meth lab on the premises other than cleaning personnels' uncorroborated testimony of chemical smells and unusual behavior of the occupants of Room 126, no exigent circumstance or probable cause existed to enter Room 127.

Having determined the entry of officers into Room 127 on both April 1 and April 2, 2007 violated Defendants rights under the Fourth Amendment, the Court now examines the affidavit of Officer Monigold offered in support of the search warrant issued by the Massillon Municipal Court. The Court finds Paragraph 17 of Officer Monigold's affidavit must be excised from the affidavit, as it is based on the unlawful entry of officers into Room 127. Therefore, any evidence found pursuant to that unlawful search, i.e. the garbage bag containing the bottles of caffeine pills, baggies with residue and the ten dollar bill, may not be offered into evidence as they are the fruit of an unlawful search. Paragraph 23 is also excised, as it discusses evidence discovered pursuant to the unlawful entry by officers on April 2, 2007, into Room 127.

The Government further contends a good faith exception applies, so if the Court should find some defect in the procedures used by the officers, such an exception militates against

suppression of the evidence.  In *United States v. Leon,* 468 U.S. 897, 905 (1984), the United States Supreme Court held, the exclusionary rule "should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective."  The Supreme Court then set forth four exceptions to the good-faith exception.  They are as follows:

>   1)   the supporting affidavit contained a knowing or reckless falsity;
>
>   2)   the issuing magistrate failed to act in a neutral and detached fashion and merely rubber stamped the police request for a warrant;
>
>   3)   the supporting affidavit lacked indicia of probable cause as to render official belief in its existence entirely unreasonable;
>
>   4)   the officers reliance on the warrant was objectively unreasonable.

In *United States v. Peltier,* 422 U.S 531, 539 (1975), the United States Supreme Court stated,

> "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."

The Supreme Court continued at 542,

> "If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."

When this Court considers the *Leon* exceptions, it does so mindful of the great deference

14

accorded magistrate determinations. However, the central theme of *Leon* is that a good faith exception exists to protect an officer's objective, good faith actions in obtaining a search warrant, even over an error by a magistrate. As the Supreme Court stated in *Leon*, "[p]enalizing the officer for the magistrates error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Leon* at 921.

In examining the evidence in light of the reasoning of *Leon* and the purposes of the exclusionary rule, the Court finds no good faith exception exists to permit into evidence that which was obtained unlawfully. Here, the error was not made by the magistrate but rather the police officers. Officer Monigold participated in both unlawful searches of Room 127 on both April 1 and April 2, 2007. Officer Monigold then drafted the affidavit in support of the search warrant and finally participated in executing the search warrant. There can be no good faith exception by the officers in such circumstances when they participated in the unlawful search. First, this Court finds it was a legal falsity to characterize the searches of Room 127 as "protective searches" in the supporting affidavit. Officer Monigold knew or should have known his search of Room 127 on both April 1 and April 2 was unlawful and unsupported by probable cause and exigent circumstances. There was no reasonable basis to believe a meth lab was present in Room 127 on April 1 or April 2. On April 1, the officers could not confirm the existence of a meth lab and could not find any corroborating evidence supporting the suspicions of the hotel employees that a meth lab was present in Room 126. The officers actions on April 1, telling hotel employees to notify the officers of the return of the occupants of Room 127, demonstrated the officers own belief that no reasonable basis existed for a search warrant of Room 127 existed on April 1. In fact, the Court is unclear what danger existed that would

15

warrant a search of Room 127 either on April 1 or April 2. Therefore, the term "protective search" is a legal falsity and cannot be the basis for a search warrant. Furthermore, the officers good faith reliance on the warrant is objectively unreasonable as the supporting affidavit was drafted by Officer Monigold who participated in the unlawful searches. By striking the offending paragraphs of the supporting affidavit, the Court finds such an affidavit would not provide a magistrate with a reasonable basis to determine probable cause exists to issue a search warrant. Such a sanction is reasonable and should serve to deter the actions of the officers and not the magistrate in keeping with the purposes of *Leon*.

Therefore, because officers lacked consent, were without probable cause and there was no exigent circumstances justifying their entry into Room 127 on either April1 or April 2 of 2007, they violated Defendant Shane Mitchell's Fourth Amendment rights. Therefore, the Court orders suppressed any and all items seized from Room 127 on either April 1 or April2, 2007, orders suppressed all statements made by Defendant on April 2, 2007, and orders suppressed any and all evidence seized from Jantre Sybole which was associated with Defendant.

IT IS SO ORDERED.


January 29, 2008          s/Christopher A. Boyko
Date          CHRISTOPHER A. BOYKO
         United States District Judge